LIGGETT SPRING & AXLE CO. *v.* MICHIGAN BUGGY CO.[1]

1. PLEADING—NOTICE OF RECOUPMENT—SUFFICIENCY.

In an action by the vendor upon a contract for the sale of carriage axles, a notice of recoupment which sets forth that the defendant had taken a large number of orders for carriages in reliance upon plaintiff's agreement to furnish the axles to be used in their manufacture, and that, in consequence of plaintiff's failure to supply the axles within the time contemplated, defendant was unable to fill many of said orders,. and was thereby deprived of large gains and profits which he would otherwise have made, is sufficiently specific; it is not necessary that the notice should set up the several orders. claimed to have been received.

2. WRITTEN CONTRACT—PAROL EVIDENCE.

Where a contract for the sale of carriage axles provides that specifications are to be furnished by the buyer, and that the axles shall be interchangeable with samples sent, but does not describe the axles, evidence of the conversation between the parties at the time of the execution of the contract is admissible for the purpose of ascertaining their intention.

3. CONTRACT—MODIFICATION—EVIDENCE.

Where the parties to a written contract are in dispute as to the construction to be given to certain of its provisions, a letter afterwards written by one party, agreeing to perform a condition claimed by the other to be imposed upon him, may effect a modification of the original contract to that extent, if not otherwise susceptible of such construction.

4. BREACH OF CONTRACT—DAMAGES—LOSS OF PROFITS.

The measure of damages for the breach of an agreement to furnish carriage axles, whereby the vendee was prevented

---

[1] Affirmed on rehearing May 19, 1896.

from completing certain carriages and filling orders received therefor, is the difference between the cost of manufacture and the selling price of the carriages the sale of which was thus prevented. *Harrow Spring Co.* v. *Whipple Harrow Co.*, 90 Mich. 147, approved.

Error to Kalamazoo; Buck, J. Submitted June 11, 1895. Decided September 27, 1895.

*Assumpsit* by the Liggett Spring & Axle Company against the Michigan Buggy Company for the breach of a contract to purchase goods. From a judgment for defendant, plaintiff brings error. Affirmed.

*Osborn, Mills & Master*, for appellant.

*Boudeman & Adams*, for appellee.

LONG, J. The defendant is engaged in the manufacture of vehicles of various kinds at Kalamazoo, this State. It employs a great number of men, and keeps constantly on the road a large number of salesmen. It also has a branch salesroom at St. Paul, Minn., and many salesmen are sent out from that point. It has no facilities for making axles, but purchases them from manufacturers. Prior to September 17, 1892, it had purchased its axles from the Sheldon Axle Company, of Wilkesbarre, Pa. Many of these axles were made from special patterns, to be used on special styles of vehicles, and it was not possible to use any other on buggies and carriages so made. These styles had become staple in the business.

In September, 1892, a representative of the plaintiff company called upon the defendant, and solicited its trade; and a contract was entered into by which the defendant agreed to purchase from plaintiff all the axles it was to use in its business up to 10,000 sets. In the contract it was specified: "Axles guaranteed to interchange with samples sent of Sheldon's axles." Mr. Lay, the secretary of the defendant company, testified, under

objection, to the arrangement with plaintiff's agent, as follows:

"I told Mr. Black that it meant a good deal to us to make a change of this kind, and I says we cannot think of changing unless we could get these axles just the same as we have been getting them. I says the Sheldon Company, they always sent these bent to form to fit our patterns, and I says, 'You can readily see the necessity of that.' I told him that we had our axle beds cut out in large numbers, and we had to have our axles to fit that shape. I called his attention to our end spring buggy, which has a drop axle. That was an axle that we were particular about. 'Oh, well,' he says, 'we can do that just as well as Sheldon, and will do it for you. All we want is your samples. Now, before you send for axles, you fix them up,—your samples,—and send them along; we will shape them to the axles just to your pattern.' And he wanted to know about what time we would want our axles to come in. I told him that during November and December we were very busy with cutters, and we would have to have our axles to come in so we could commence on them right after we got through our cutters, probably the last of December or the first of January. 'Well,' he says, 'you will have to get in your specifications then by about the first of December.' I told him I thought we could do that. So we drew up the contract, and Mr. Lane signed it.

"*Q.* Well, have you stated now all the talk that you recall that you had at that time with him?

"*A.* Well, all that was material in regard to that. Of course, Mr. Black went on to tell— He said that he was taking a good many contracts at that price that he was making,—seemed to catch them. It was a price below what the others were selling. * * * I told him we had been getting our axles from the Sheldon Axle Company of Wilkesbarre, Pa. We had gotten our axles of them (Sheldon) the year before.

"*Q.* Now, you may state what, if anything, was said at that time about the setting at the collar when Mr. Black was there.

"*A.* Well, that was—We referred to the number 53 axle; that is our end spring buggy. That was a drop on the axle, and we told him that we had to have it set right at the collar. We explained to him why. The shape of

the axle is different. It was made on a kind of a little arch,—a drop; and, unless it is shaped right at the collar, the wheel won't run on a plumb spoke."

Mr. Black was then and there shown the axles which were afterwards sent his company as patterns from which to make such axles. The matter was gone over somewhat at this time, and the contract entered into between the parties. The defendant claims it was induced by Mr. Black to enter into this contract because of the reduction in the price of the axles which he made, and because of his representations and promises that the plaintiff would set the axles at the collar, bend them, and make them of the same shape and style for defendant and furnish them to it just as the Sheldon Axle Company had done the previous year.

The defendant sent samples and specifications to plaintiff December 6, 1892, and on the same date sent an order for a large number of axles. The plaintiff received defendant's samples December 17th, and on the 24th replied as follows:

"Pittsburg, Pa., December 24, 1892.
"Michigan Buggy Company,
        "Kalamazoo, Mich.
    "*Gentlemen*: Your favor of 22d. It is simply a question of time, gentlemen. Had you sent the samples right along, as you should have done, immediately after the contract was made, and allowed the specifications to follow within the time specified in contract, it would have been all right. To get out all these patterns and forms will require a month to six weeks of time. We thought you would rather have this order come regular. Which shall it be?"

Defendant replied to this letter as follows:

"December 26, 1892.
    "*Gentlemen:* I am in receipt of yours of the 24th, and in reply will say that we want the axles as per agreement, made to fit our forms, bent to shape as per sample. We must have them right away. We know it does not take

a month or six weeks to get out a form to fit these axles to."

Plaintiff replied:

"December 28, 1892.

"*Dear Sir:* Your letter 26th. Replying to same, we beg to say that there is no agreement, either in the contract or outside of it, providing for the forming of your axles to pattern. There would be no serious objection to this had you advised us and sent the samples promptly after the contract was made. We are now very busy, and it will not be possible to get out these forms and make preparations to do the work in less than the time stated,—a month or six weeks. You state that you must have the axles promptly. It would not now be possible to make shipments in less than thirty days, regular axles. Give us your definite answer at once, stating whether you will accept the goods regular shapes or not." .

To this defendant replied:

"December 31, 1892.

"*Gentlemen:* We are in receipt of yours of the 28th. Please hurry out the axles ordered, regular; and we want those ordered shaped to pattern, shaped as ordered, even if it takes a month or six weeks." .

Plaintiff shipped, all told, 1,328 sets, of which 505 sets were returned, because they were not made according to the samples, leaving 823 sets retained by defendant out of the 3,575 sets ordered. No axles were received by defendant for a period of two months and eighteen days after the order was sent in by defendant, and the first axles received were not made according to the samples sent, and had to be returned, or were all hinds and no fronts, or all fronts and no hinds, and therefore absolutely useless to defendant unless they were matched up.

The defendant claims to have had on hand a large number of orders and contracts for vehicles, and, because of the failure of plaintiff to comply with the contract, the defendant was not only hindered in its business, but

its men were without material to work with; that, when the axles were sent, they were not set at the collar, and, in consequence, the wheels, when put on the spindles, would not stand at right angles with the axles, but would stand in at the top or bottom from one to three inches too far; that such axles as defendant ordered under this contract could not be bought in the open market, but were made of special forms and shapes, and thus made it necessary for plaintiff to have the samples.

The plaintiff made claim for the payment of the axles sent, which was refused, and this action was brought upon the contract. Defendant pleaded the general issue, and gave notice of recoupment of damages. On the trial the jury returned a verdict in favor of defendant.

1. When the defendant offered testimony in support of its claim under the notice, it was objected to as incompetent, for the reason that the notice was not sufficiently specific, in that it did not set up a single order it had received and accepted and was unable to fill, and therefore presented no fact which could be tried, so far as the alleged loss of profits was concerned. The notice sets forth that defendant had and took a large number of orders and made a large number of contracts for buggies and carriages relying upon the plaintiff, under its contract, to furnish axles as agreed, to be used in the manufacture of carriages; but, on account of plaintiff's failure to furnish such axles as agreed and within the time contemplated by such contract, the defendant was unable to finish and complete many of its buggies for which it had orders and contracts, and by reason thereof defendant was unable to fill many of said orders and contracts, and thereby defendant lost the sale of many buggies and carriages, and lost and was deprived of large gains and profits which it otherwise would have made had it not been for plaintiff's refusal to carry out its aforesaid contract with defendant, and which loss amounted to the sum of $5,000. The notice further sets

up that, after endeavoring to obtain axles as agreed upon, the said plaintiff holding out to and promising defendant from day to day to forward such axles as agreed, nearly all of which promises remained unfulfilled, the defendant was obliged at last, to save its entire business from ruin, to purchase some axles elsewhere to take the place of those which plaintiff was to furnish, and for which axles purchased defendant was obliged to pay a greater price than plaintiff was to furnish the same for. The notice also sets up that plaintiff, instead of furnishing axles in sets as ordered, and as it should have done, furnished at times all front axles, and at other times all rear axles, and defendant could not use them in this condition, and was thereby delayed and injured in its work. It also sets up loss of time of employés because of plaintiff's neglect to furnish axles, and some other matters not specially set up, and claims the right to recoup all of the damages so sustained by plaintiff's neglect and default to furnish axles as agreed, and to have the same set off against plaintiff's claim, and judgment for any balance.

The notice is not required to contain all the requisites of a special plea under the former practice, nor is it required to contain the substance of a special plea, or be good on general demurrer. *Cresinger* v. *Reed*, 25 Mich. 450; *Rosenbury* v. *Angell*, 6 Mich. 514; *McHardy* v. *Wadsworth*, 8 Mich. 349; *Bailey* v. *Kalamazoo Publishing Co.*, 40 Mich. 254; *Browne* v. *Moore,* 32 Mich. 257; *Farmers' Mut. Fire Ins. Co.* v. *Crampton*, 43 Mich. 421; *Briesenmeister* v. *Supreme Lodge K. of P.*, 81 Mich. 525. The notice not only apprised the plaintiff of the nature of the defense to be made, but specifically set forth the manner in which the profits were lost. It does not leave them speculative or uncertain, but shows that the loss of profits is upon actual contracts and orders which defendant had taken relying upon plaintiff to furnish the axles. In *Briesenmeister* v. *Supreme Lodge K. of P., supra*, the rule was stated as follows:

"The sole test of the sufficiency of a notice of special matter of defense is that it shall apprise the plaintiff of the nature of the defense relied on, so that he may be prepared to meet it and to avoid surprise on the trial."

We think the notice was sufficient.

2. It is contended that it was error to permit the defendant to give in evidence the conversations with plaintiff's agent at the time the contract was made. The contract, however, specified that specifications were to be furnished, and axles guaranteed to interchange with samples sent of Sheldon's axles. These axles were not described in the contract, and the specifications mentioned were to be furnished in the future. The contract could only be understood in those particulars by what was said at the time of its execution; but, were this not admissible, yet, by the letters of the plaintiff, it was agreed that these axles should be set at the collar and shaped to a certain form. If the original contract did not contemplate such conditions, the letters would constitute a modification of the contract, and could be shown. Bish. Cont. § 764.

3. It is contended that the defendant sought to show the alleged loss of profits by wholesale. Instead of this, the witness gave the cost of each vehicle mentioned in the orders his attention was directed to, and the whole question was left to the jury under a fair charge, which limited the recovery to such orders for vehicles as defendant had in fact received and was not able to fill by reason of the neglect of plaintiff to supply the axles under the contract. The measure of damages is in accordance with the rule of *Harrow Spring Co.* v. *Whipple Harrow Co.,* 90 Mich. 147.

4. Some contention is made that the court was in error in refusing certain requests to charge. Substantially, the court gave such of these requests as were proper to be given. The court charged the jury that the burden of proof was upon the defendant to show that the plaintiff agreed to form the axles to pattern and set them at the

collar; and upon the question of the measure of damages we find no error in the charge. The case, we think, was very fairly tried, and all questions of fact left to the jury. We find no error which would warrant a reversal of the case.

Judgment is affirmed.

The other Justices concurred.